UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Auzio Hewlett,** | **Civil No. 12-0304 (JNE/JJG)** |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **Captain Gram, Jessica Gage, and Lieutenant Santine,** | |
| **Defendants.** | |

JEANNE J. GRAHAM, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 17). As set forth below, the Court recommends that summary judgment be granted to Defendants on the basis of qualified immunity.

I.   Introduction

Plaintiff Auzio Hewlett ("Hewlett") is an inmate at the Federal Correctional Institution (FCI) in Big Spring, Texas. He filed this action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), seeking relief for violations of his federal constitutional rights that allegedly occurred when he was incarcerated at the FCI in Sandstone, Minnesota. Defendants Edward Gramm ("Gramm"), Jessica Gage ("Gage"), and Jose Santini ("Santini")[1] were employed at FCI Sandstone during the relevant events.

---

[1] Edward Gramm's and Jose Santini's names are misspelled in the caption of the Complaint. The Court will use the correct spelling in the body of this Report and Recommendation.

Hewlett alleges in his Complaint that Gage wrongly accused Hewlett of looking in her direction and making inappropriate comments while standing in line to use the telephone. (Compl. ¶ 2.) Hewlett subsequently was summoned to Lieutenant William Earl's office, where Lieutenant Earl told Hewlett that if he ever looked at another female officer again in a non-business manner, Lieutenant Earl would accuse Hewlett of stalking and transfer him to another facility. (*Id.* ¶ 1.) Later that evening, Hewlett was taken to the Security Housing Unit (SHU) and placed under investigation. (*Id.* ¶ 3.) No charges or incident reports were ever filed. (*Id.* ¶ 8.) Nevertheless, after Hewlett was released from the SHU, Santini and Gramm transferred him to another facility and placed a notation of stalking in his file. (*Id.* ¶ 10.)

Hewlett contends that Defendants violated his right to due process by holding him in the SHU even though no charges or incident report were filed, transferring him to FCI Big Spring, and placing the stalking notation in his file. (*Id.* ¶¶ 8-10.) He also alleges unlawful retaliation in violation of his First Amendment right to free speech. (*Id.* ¶ 5.)

## II.     Procedural Background and Standard of Review

On August 21, 2012, Defendants filed a motion to dismiss or for summary judgment on the grounds of exhaustion and qualified immunity. Defendants filed hundreds of pages of evidentiary materials in support of their motion and referred to those materials throughout their memorandum. After the motion was filed, the Court ordered Hewlett to file a "response and supporting documentation" by September 30, 2012. (Order at 1, Aug. 22, 2012, ECF No. 25.) Hewlett requested additional time to respond, which the Court granted, and Hewlett later filed a memorandum, several declarations, and exhibits in opposition to the motion. Defendants filed a reply memorandum on November 14, 2012.

Although Defendants captioned their motion in part as a motion to dismiss, they did not apply any Federal Rule of Civil Procedure 12 standards to Hewlett's claims. Defendants' arguments and evidentiary submissions resemble those typically made in summary judgment motions, not motions to dismiss. At the Court's direction, Hewlett also submitted evidence outside the pleadings.

The Court intends to consider all of the materials filed by the parties and will therefore treat Defendants' motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d). Because Hewlett was instructed to file evidentiary materials in opposition to the motion, and in fact did so, the Court finds he received adequate notice that the motion to dismiss might be converted and was given a reasonable opportunity to present pertinent material. *See id.*; *Davis v. Johnson Controls, Inc.*, 21 F.3d 866, 867 (8th Cir. 1994). Hewlett has neither shown nor asserted that any material facts are disputed or missing. *See Davis*, 21 F.3d at 867.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Chial v. Sprint/United Mgmt. Co.*, 569 F.3d 850, 853-54 (8th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). The moving party bears the burden to show that the material facts are not in dispute. *Mems v. City of St. Paul*, 224 F.3d 735, 738 (8th Cir. 2000). The nonmoving party may not respond with mere allegations or denials but must present specific facts creating an authentic issue for trial. *Anderson*, 477 U.S. at 256. The evidence and resulting inferences are viewed in the light most favorable to the nonmoving party. *Graves v. Ark. Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir. 2000).

## III. Facts

Hewlett was incarcerated at FCI Sandstone from February 26, 2008, until May 5, 2010. (Buege Decl. ¶ 3, ECF No. 20.) Gage was a correctional officer at FCI Sandstone during that period of time. Hewlett's first interaction with Gage occurred in December 2009. (Hewlett Decl. ¶ 3, ECF No. 31.) On several occasions, Gage allowed Hewlett and other inmates to enter the B Unit even though they were not assigned to that unit. (*Id.* ¶ 4.) One day, Hewlett was not able to leave the B Unit during the ten-minute authorized move, and Gage locked him in the unit until the next authorized move. (*Id.*) During that hour, Gage asked Hewlett personal questions about his sentence and family. (*Id.* ¶ 5.) Hewlett and Gage had several other interactions (*id.* ¶¶ 7-9), but after a month or two, they agreed not to engage in further conversation (*id.* ¶ 13).

Hewlett and Gage remember their interactions differently. Gage felt Hewlett attempted to engage in inappropriate personal conversations and was always in her area. (Gage Decl. ¶¶ 3-10.) According to Gage, Hewlett would linger in her area or office, asking her questions about what she was reading, what she liked to do in her spare time, and her hair color. (*Id.* ¶¶ 3-4.) Gage advised him she did not want to engage in personal conversations. (*Id.* ¶¶ 3, 5.) Gage also remembers Hewlett asking to read her palm and commenting that he was interested in talking only to female, not male, officers. (*Id.* ¶ 6.) Hewlett's comments made Gage feel uncomfortable and she repeatedly instructed him not to talk to her unless there was an emergency. (*Id.* ¶¶ 6, 7.) On February 3, 2010, Gage saw Hewlett standing in her area and looking at her. (*Id.* ¶ 8.)

Hewlett denies ever going out of his way to interact with Gage and claims she initiated personal conversations with him. (Hewlett Decl. ¶¶ 5-6, 17.) He recalls Gage asking about his children, complaining about her son's father, and sharing unpleasant job experiences. (*Id.* ¶¶ 5, 9.) According to Hewlett, Gage asked him at one point if he had told other inmates anything

4

about her personal business, and he said he had not, but she did not believe him. (*Id.* ¶ 13.) Hewlett told Gage not to worry because he would never speak to her again. (*Id.*)

On February 5, 2010, Hewlett and another inmate waited outside the inmate telephone room, talking with each other and other inmates. (*Id.* ¶ 15.) Gage stood about fifteen feet away. (*Id.*) According to Hewlett, he heard Gage yelling someone's name as he was about to dial a phone number, and another inmate told him Gage was yelling Hewlett's name. (*Id.*) Gage then told Hewlett, with a smile on her face, that Lieutenant Earl wanted to see Hewlett in his office. (*Id.*) Gage remembers the incident differently. According to Gage, she saw Hewlett staring at her, smiling, and shaking his head as he waited to enter the telephone room. (Gage Decl. ¶ 9.) In light of other events during the past month, Gage felt Hewlett was stalking her. (*Id.* ¶ 10.)

Gage took her concerns to Lieutenant Earl. (*Id.* ¶ 11.) She said Hewlett was making her feel uncomfortable and asked that he be placed in the SHU. (*Id.*) Lieutenant Earl asked to speak to Hewlett, and during their conversation, asked Hewlett why he was looking at Gage in an inappropriate manner. (Hewlett Decl. ¶ 16.) Lieutenant Earl said if he ever heard another similar complaint, Hewlett would be transferred far away. (*Id.*) Lieutenant Earl placed Hewlett in the SHU later that night, based on Gage's allegation of stalking and pending an investigation. (Gramm Decl. ¶ 3 & Ex. A, ECF No. 22.)

Special Investigative Supervisor (S.I.S.) Jose Santini investigated Gage's allegations. (Gramm Decl. ¶ 3.) Based on a written account provided by Gage and inmate interviews, Santini issued a report on March 15, 2010, recommending a greater security transfer. (Gramm Decl. ¶ 3 & Ex. B.) Santini characterized Hewlett's behavior as an attempt to compromise a female staff member through his demeanor and attempts to obtain personal information. (Gramm Decl. Ex. B.) At that time, there was no charge or code violation for stalking (Gramm Decl. ¶ 3), but

Santini felt that Hewlett's actions were not appropriate and he was not suitable to remain at FCI Sandstone because of the possibility of harm to Gage (Santini Decl. ¶ 3). The Warden decided to retain Hewlett in the SHU pending the transfer. (Gramm Decl. ¶ 3.)

On April 3, 2010, Hewlett wrote a request to Gramm asking for a copy of the incident report. (Pl.'s Response Ex. 2, ECF No. 30.) He acknowledged receiving a copy of the Order of Administrative Detention, but noted that the document did not contain the specific regulation he was charged with violating. (*Id.*) Hewlett accused Lieutenant Earl of violating his right to due process by declining to hear his explanation and not affording him a hearing. (*Id.*) Hewlett also accused Gage of retaliation. (*Id.*) Hewlett was later interviewed by another S.I.S., but was not told why he was being investigated. (*Id.* ¶ 19.)

On June 1, 2010, Hewlett filed an informal Request for Administrative Remedy, claiming that Gage filed a false claim against him in retaliation for her allegedly mistaken belief that Hewlett and another inmate had talked about her and looked at her in an inappropriate manner on February 5, 2010. (Buege Decl. Ex. D.) Hewlett requested that Gage be suspended or fired and that he be transferred to a facility near his release address. (*Id.*) The staff's response on July 15, 2010, was that the interaction had caused concern for the safety of FCI Sandstone staff and the institution, which was the reason for Hewlett's transfer. (*Id.*)

On July 20, 2010, Hewlett filed a Request for Administrative Remedy form concerning the February 5 incident. (*Id.*) Hewlett accused Gage of filing a false complaint against him in retaliation for her allegedly mistaken belief that Hewlett and another inmate had talked about her and looked at her in an inappropriate manner. (*Id.*) Hewlett said he was summoned to Lieutenant Earl's office, verbally reprimanded, forbidden from telling his side of the story, and placed in the SHU without notification of the Bureau of Prisons (BOP) regulation he allegedly violated. (*Id.*)

Hewlett also complained that Lieutenant Earl entered a stalking notation in his file. (*Id.*) Hewlett challenged his SHU placement and Lieutenant Earl's handling of the incident, and requested a transfer. (*Id.*)

FCI Big Spring Warden K. Edenfield responded to Hewlett's request on September 2, 2010. (*Id.*) Warden Edenfield assured Hewlett his complaint of staff misconduct would be taken seriously and investigated. (*Id.*) Warden Edenfield implicitly denied Hewlett's request for a transfer, noting he was in a facility appropriate to his security level and needs. (*Id.*)

Hewlett next appealed to the Regional Director on September 16, 2010. (Buege Decl. Ex. E.) Hewlett repeated his prior contentions concerning Gage's alleged false claim, the alleged retaliation, and his transfer. (*Id.*) Hewlett also raised a challenge to FCI Big Spring's housing conditions. (*Id.*) In response, Regional Director G. Maldonado explained that Hewlett had been placed in the SHU pending an investigation pursuant to BOP Program Statement 5270.08. (*Id.*) Maldonado also told Hewlett no evidence supported his allegations that Gage filed a false claim or retaliated against him. (*Id.*)

Hewlett filed his next appeal on December 13, 2010, expanding on the grounds asserted previously. (Buege Decl. Ex. F.) National Inmate Appeals Administrator Harrell Watts denied his requests. (*Id.*)

**IV.     Exhaustion**

The Prisoner Litigation Reform Act provides in relevant part, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Proper exhaustion means that the prisoner must have utilized each step the Bureau of Prisons (BOP) has implemented and must

have complied with all deadlines and procedural rules. *See Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Under the BOP's administrative remedy procedure, an inmate must first present his concern informally to a prison staff member. 28 C.F.R. § 542.13(a). If the issue is not resolved informally, the inmate must submit an Administrative Remedy Request on a BP-9 form to a designated staff member. 28 C.F.R. § 542.14(a), (c)(4). The deadline for completing both of these steps is twenty calendar days after the incident. 28 C.F.R. § 542.14(a). If the inmate wishes to challenge the Warden's decision, he or she may appeal to the Regional Director within twenty days of the Warden's response, and then to the General Counsel within thirty days of the Regional Director's decision. 28 C.F.R. § 542.15(a). The inmate may not raise an issue on appeal that was not raised in earlier filings. 28 C.F.R. § 542.15(b)(2). An appeal taken to the General Counsel is deemed the final administrative action. 28 C.F.R. § 542.15(a).

Here, Defendants concede Hewlett fully exhausted his retaliation claim. Defendants submit, however, that Hewlett did not exhaust his due process claim. The Court disagrees. While Hewlett may not have used the term "due process" on the required forms, he referenced some basis for that claim at each step of the administrative remedial process. At every step, he challenged his placement in the SHU, the prison staff's refusal to identify the BOP regulation of which he was accused, or his transfer. Granting a liberal construction to Hewlett's filings, the Court concludes that summary judgment should not be granted for lack of exhaustion.

V. **Qualified Immunity**

Defendants next claim they are entitled to qualified immunity. This doctrine "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v.*

*Howards*, 132 S. Ct. 2088, 2093 (2012). In the context of a summary judgment motion, the Court answers two questions in determining whether Defendants are entitled to qualified immunity: (1) whether the facts, as viewed most favorably to Hewlett, demonstrate a deprivation of a constitutional right, and (2) whether the right was clearly established at the time of the alleged deprivation. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010).

**A. First Amendment**

Hewlett asserts he was placed in administrative detention and transferred to another facility in retaliation for exercising his First Amendment rights. Specifically, Hewlett claims he engaged in protected speech on February 5, 2010, when he talked to another inmate, smiled, and shook his head in response to the other inmate's comments.

**1. Whether the Right Was Clearly Established**

Broadly speaking, it is clearly established that the First Amendment forbids retaliation for protected speech. *See Crawford-El v. Britton*, 523 U.S. 574, 592 (1998). The right is not absolute, however, especially in a corrections context, where "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Thus, courts have held there is no clearly established First Amendment right for an inmate to speak to a prison official who was disciplining another inmate, *Rodriguez v. Phillips*, 66 F.3d 470, 478 (2d Cir. 1995); "no absolute First Amendment right to communicate with other inmates about legal or other matters," *Bear v. Kautzky*, 305 F.3d 802, 805 (8th Cir. 2002); and no First Amendment right to mock a corrections officer to another inmate, *Goff v. Dailey*, 991 F.2d 1437, 1439 (8th Cir. 1993).

9

Determining whether a right was clearly established at the time of the alleged deprivation "is a fact-intensive inquiry and 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Littrell v. Franklin*, 388 F.3d 578, 583 (8th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Hewlett bears the burden to establish the asserted right was clearly established. *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002). Other than denying he was talking about Gage on February 5, 2010, however, Hewlett has not described the subject matter of his conversation with the other inmate. Therefore, the Court cannot engage in the required fact-intensive inquiry, and Hewlett has not met his burden to establish that his asserted right to speak with the other inmate was clearly established. Consequently, Defendants are entitled to qualified immunity on Hewlett's First Amendment claims.

### 2. Whether the Right Was Infringed

Although the qualified immunity analysis need not proceed once a court finds the asserted right was not clearly established, *Garcia v. City of St. Paul*, Civ. No. 09-0083 (JNE/AJB), 2010 WL 1904917, at *6 (D. Minn. May 10, 2010), the Court will address the other prong in the alternative. Hewlett asserts he was transferred in retaliation for exercising his First Amendment rights. Prison officials generally can transfer an inmate for any reason, but an inmate cannot be transferred in retaliation for exercising a constitutionally protected right. *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1996) (quotation and citation omitted). The prisoner faces a significant hurdle in proving that the actual motivating factor was retaliation. *Id.* (quotation omitted). The Court applies a "but-for" standard, and "the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred." *Id.* at 738.

Hewlett also asserts he was placed in administrative detention for exercising his First Amendment rights. "Just as prison officials cannot lawfully transfer a prisoner for retaliatory reasons alone, so they cannot impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right." *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989). To establish a prima facie case of retaliatory discipline, Hewlett must show that (1) he exercised a constitutionally protected right; (2) he was disciplined; and (3) his exercise of the right motivated the discipline. *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007). Hewlett bears a heavy evidentiary burden, and mere allegations that the act was retaliatory will not suffice. *Id.* (citations omitted). Because the standards for retaliatory transfer and retaliatory discipline have some overlap, the Court will consider the two claims together.

Hewlett's First Amendment claims fail on several counts. First, he has not established that he was engaging in constitutionally protected speech with the other inmate. Not all speech is protected by the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). As discussed above, Hewlett has not described the subject matter of his conversation with the other inmate, and he carries the burden to establish that his speech was protected. Thus, he cannot succeed on either his retaliatory transfer claim or his retaliatory discipline claim.

Second, Hewlett has not alleged sufficient facts demonstrating a retaliatory motive by any defendant. To avoid summary judgment, Hewlett must present "affirmative evidence" of a retaliatory motive, *see Crawford-El*, 523 U.S. at 600; *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007), but Hewlett offers no more than bare allegations and speculation, *see Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996). Relatedly, Hewlett has not shown that his allegedly protected speech—that is, his conversation with the other inmate—was the motivating factor for his transfer. *See Griggs v. Norris*, 297 F. App'x 553, 555 (8th Cir. 2008). No evidence supports

11

the conclusion that Hewlett was transferred for talking to another inmate. Rather, even viewing the evidence in the light most favorable to Hewlett, it is undisputed that Gage *believed* Hewlett had been stalking her for more than a month, and she felt uncomfortable around him. Hewlett has not shown Gage's asserted beliefs or emotions to be false. The resulting investigation culminated in a finding that Hewlett had attempted to compromise a female staff member at the prison, which was the reason for the transfer.

In sum, Hewlett has not demonstrated a deprivation of a constitutional right by either his transfer or his SHU placement. Accordingly, Defendants are entitled to qualified immunity on this ground as well.

### B. Due Process

There are three components to Hewlett's due process claim: his placement in the SHU, his transfer to FCI Big Spring, and the stalking notation in his file. Defendants again request summary judgment on the basis of qualified immunity, and the Court begins with the question whether the facts, viewed in Hewlett's favor, demonstrate a deprivation of due process.

#### 1. Transfer

A convicted prisoner has no constitutional right to be housed at a specific institution. *Meachum v. Fano*, 427 U.S. 215, 224 (1976). A prisoner's expectation "in remaining at a particular prison . . . is too ephemeral and insubstantial to trigger procedural due process protections." *Id.* at 228. A convicted prisoner also has no constitutional right not to be transferred to another prison, interstate or intrastate. *Olim v. Wakinekona*, 461 U.S. 238, 245, 247 (1983) (noting "it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State.").

This is true even when the transfer results in "more adverse conditions of confinement," *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citing *Meachum*, 427 U.S. at 225), or separation from home and family, *Olim*, 461 U.S. at 248 n.9. As long as the transfer was not made "for prohibited or invidious reasons" and does not violate the Constitution independently, due process is not offended. *Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir. 1996); *see also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (requiring inmate to show an atypical and significant hardship in order to implicate the Due Process Clause).

Here, Hewlett has not shown that the transfer was made for a prohibited or invidious reason or otherwise violated the Constitution. FCI Sandstone Warden Scott Fisher requested the transfer based on an S.I.S. report finding that Hewlett had attempted to compromise Gage through his demeanor and by trying to obtain personal information from her. (Gramm Decl. Ex. B.) Taken at face value, this reason is not invidious or unconstitutional. Furthermore, as discussed previously, Hewlett has not shown he engaged in a constitutionally-protected activity or that any defendant retaliated against him for engaging in such activity. Nor has Hewlett shown that, but for the retaliation, the transfer would not have occurred.

Hewlett does not argue that Defendants failed to follow prison policy or fundamental due process concepts in requesting or effecting the transfer. Nor does Hewlett argue he had a liberty interest in remaining at FCI Sandstone or that his transfer to FCI Big Spring imposed an atypical and significant hardship. Accordingly, Hewlett has not demonstrated that his transfer deprived him of due process, and Defendants should be accorded qualified immunity on this claim.

### 2. SHU Placement

Lieutenant Earl placed Hewlett in the SHU on February 5, 2010, pursuant to an Administrative Detention Order. (Gramm Decl. Ex. A.) Hewlett was transferred to FCI Big

Spring on May 5, 2010, approximately three months later. (Gramm Decl. Ex. B.) Hewlett argues that due process was offended because no charges or reports were ever filed and he continued to be held after the investigation was closed.

Inmates may be placed in the SHU for either disciplinary segregation or administrative detention. 28 C.F.R. § 541.22. Administrative detention removes the inmate "from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public" and is non-punitive. *Id.* § 541.22(a). Disciplinary segregation, on the other hand, "is a punitive status imposed only by a Discipline Hearing Officer (DHO) as a sanction for committing a prohibited act(s)." *Id.* § 541.22(b).

Hewlett was placed in the SHU first for investigation and later for a pending transfer, both of which are classified as administrative *detention*, 28 C.F.R. §§ 541.23, 541.23(c)(1)-(2). Hewlett claims a liberty interest was created by 28 C.F.R. § 541.5(b). This regulation applies to disciplinary *segregation*, however, *see* 28 C.F.R. § 541.5, and thus did not apply to Hewlett.

With respect to Hewlett's argument that no incident report was filed and he was not charged with a violation of prison rules, these procedures are not required for inmates in administrative detention: "When placed in administrative detention status, you will receive a copy of the administrative detention order, ordinarily within 24 hours, detailing the reason(s) for your placement." 28 C.F.R. § 541.25(a). Here, an administrative detention order was completed on February 5, 2010, and given to Hewlett on February 6, 2010. (Gramm Decl. ¶ 3 & Ex. A.) Hewlett has not shown that due process required more than the process provided by § 541.25(a).

Even if Defendants had not complied with the relevant BOP regulations, Hewlett has not shown that his SHU placement worked an atypical and significant hardship. An inmate who makes a due process challenge to his placement in administrative detention must "make a

14

threshold showing that the deprivation of which he complains imposed an 'atypical and significant hardship.'" *Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002) (quoting *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000)). The Eighth Circuit has consistently held that administrative segregation is not an atypical and significant hardship. *Id.* (citing *Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997); *Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996); *Wycoff v. Nichols*, 94 F.3d 1187, 1190 (8th Cir. 1996)). This is true even when the placement is without cause. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003). In order to assert a liberty interest, the inmate must identify "some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." *Id.* Hewlett has made no such showing here.

In sum, Plaintiff has not shown a deprivation of due process caused by his SHU placement, and Defendants should be granted qualified immunity on this claim.

### 3. The Stalking Notation

Hewlett believes his custody classification has been adversely affected by a finding of stalking noted in his file. He argues that Program Statement 5100.08 requires a documented finding of guilt before an inmate's custody classification can be downgraded based on a history of violence. Hewlett is correct. An inmate's history of violence is one factor used to determine his custody classification. (Defs.' Ex. 1 at 60.) The custody classification "dictates the degree of staff supervision required for an individual inmate." (*Id.* at 11.) Points for a history of violence can be entered only for "those acts for which there are documented findings of guilt (i.e., DHO, Court, Parole, Mandatory Release, or Supervised Release Violation)." (*Id.* at 60.) An inmate's custody classification can be downgraded for acts committed during the term of incarceration,

15

but only if a finding of guilt is made pursuant to an institutional disciplinary hearing. (*Id.* at 61.) No such hearing occurred in Hewlett's case, and there were no documented findings of guilt.

Defendants downplay the lack of required findings: "Although Plaintiff did not have such a history, it is formalistic to suggest that if stalking occurs while in prison, it should be treated differently than when it is committed outside prison walls." (Defs.' Mem. Supp. Mot. Dismiss or Summ. J. at 5 n.2.) Defendants miss the mark. Acts of violence committed in prison can affect an inmate's custody classification, but only if there are documented findings of guilt made pursuant to a hearing. In Hewlett's case, this did not occur.

Nevertheless, the question for the Court is whether the failure to abide by Program Statement 5100.08's custody classification procedure violated due process. Other courts facing the issue have concluded that a change in custody classification is not an atypical and significant hardship. *E.g., Aldaco v. Holder*, Civ. No. 10-590 (JRT/LIB), 2011 WL 825624, at *5 (D. Minn. Jan. 7, 2011) (citing cases), *adopted by* 2011 WL 839388 (D. Minn. Mar. 7, 2011); *Reyes v. Holland*, No. 0:11-CV-00090-HRW, 2012 WL 639469, at *3 (E.D. Ky. Feb. 27, 2012); *Rodriguez-Leon v. Zickefoose*, Civ. No. 11-1172 (RBK), 2012 WL 32924, at *3 (D.N.J. Jan. 3, 2012); *Quijada v. Bledsoe*, Civ. No. 1:CV-08-2022, 2011 WL 1303224, at *7 (M.D. Pa. Mar. 31, 2011). Hewlett has not identified any facts evidencing an atypical and significant hardship in his case. Consequently, Defendants are entitled to qualified immunity on this claim.

## VI. Recommendation

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 17) be **GRANTED** as to summary judgment;

2. This case be **DISMISSED WITH PREJUDICE**; and

3. **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 12, 2013    s/ *Jeanne J. Graham*

JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **March 4, 2013**. A party may respond to the objections within fourteen (14) days after service thereof. Any objections or responses shall not exceed 3,500 words. The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.